## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JASON CONNOLE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ZOE'S KITCHEN, INC., GREG DOLLARHYDE, KEVIN MILES, THOMAS BALDWIN, SUE COLLYNS, CORDIA HARRINGTON, and ALEC TAYLOR,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMAND |

Plaintiff Jason Connole ("Plaintiff"), on behalf of himself and all others similarly situated, upon information and belief, including an examination and inquiry conducted by and through his counsel, except as to those allegations pertaining to Plaintiff, which are alleged upon personal belief, alleges the following for his Class Action Complaint:

### NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder class action brought by Plaintiff on behalf of himself and all other public stockholders of Zoe's Kitchen, Inc. ("Zoe's Kitchen" or the "Company") against Zoe's Kitchen and the members of Zoe's Kitchen's Board of Directors (the "Board" or the "Individual Defendants," and together with Zoe's Kitchen, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which Zoe's Kitchen

will be acquired by privately held Cava Group, Inc. ("CAVA") through Pita Merger Sub, Inc. ("Merger Sub") (the "Proposed Transaction").

2.      On August 17, 2018, Zoe's Kitchen and CAVA issued a joint press release announcing they had entered into an Agreement and Plan of Merger dated August 16, 2018 ("Merger Agreement") to sell Zoe's Kitchen to CAVA.   Under the terms of the Merger Agreement, each Zoe's Kitchen stockholder will receive $12.75 for each share of Zoe's Kitchen common stock they own (the "Merger Consideration").   The Proposed Transaction is valued at approximately $300 million and will be financed through a significant equity investment in CAVA led by Act III Holdings, LLC ("Act III"), the investment vehicle created by Ronald M. Shaich ("Shaich"), founder, chairman, and former Chief Executive Officer ("CEO") of Panera Bread Company ("Panera Bread"), and funds advised by The Invus Group LLC ("Invus"), with participation from existing investors SWaN & Legend Venture Partners and Revolution Growth.

3.      On September 10, 2018, Zoe's Kitchen filed a Definitive Proxy Statement on Schedule 14A (the "Proxy Statement") with the SEC.   The Proxy Statement, which recommends that Zoe's Kitchen stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) potential conflicts of interest faced by Company insiders and the Company's financial advisor, Piper Jaffray & Co. ("Piper Jaffray"); (ii) the background process leading to the Proposed Transaction; and (iii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Piper Jaffray.   The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as Zoe's Kitchen stockholders need such information in order to make a fully informed decision whether to vote in favor of the Proposed Transaction or seek appraisal.

4.     In short, unless remedied, Zoe's Kitchen's public stockholders will be forced to make a voting or appraisal decision on the Proposed Transaction without full disclosure of all material information concerning the Proposed Transaction being provided to them.  Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.     This Court has jurisdiction over the Defendants because each Defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## THE PARTIES

8.     Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Zoe's Kitchen.

9.     Defendant Zoe's Kitchen is a Delaware corporation, with its principal executive offices at 760 State Highway 121, Suite 250, Plano, Texas 75024.  Zoe's Kitchen is a fast-casual restaurant serving a menu of Mediterranean-inspired dishes.  Zoe's Kitchen's common stock trades on the New York Stock Exchange under the ticker symbol "ZOES."

10.    Defendant Greg Dollarhyde ("Dollarhyde") has served as Chairman of the Board and a director of the Company since 2007.  Defendant Dollarhyde previously served as CEO of the Company from October 2008 through March 2011.

11.    Defendant Kevin Miles ("Miles") has served as the Company's President and CEO since October 2012, as a director since December 2013, and as President and Chief Operating Officer since February 2011.  Defendant Miles previously served as Executive Vice President of Operations beginning in 2009.

12.    Defendant Thomas Baldwin ("Baldwin") has been a director of the Company since 2014.

13.    Defendant Sue Collyns ("Collyns") has been a director of the Company since 2014.

14.    Defendant Cordia Harrington ("Harrington") has been a director of the Company since 2015.

15.    Defendant Alec Taylor ("Taylor") has been a director of the Company since 2015.

16.    Defendants Dollarhyde, Miles, Baldwin, Collyns, Harrington, and Taylor are referred to herein as the "Board" or the "Individual Defendants" and collectively with Zoe's Kitchen, as the "Defendants."

## OTHER RELEVANT ENTITIES

17.    CAVA, a Delaware corporation, is a privately held company that owns and operates a chain of Greek and Mediterranean restaurants.  CAVA was founded in 2010 and is headquartered in Washington, D.C.

18.    Merger Sub is a Delaware corporation and a wholly-owned subsidiary of CAVA.

19.     Act III is a Boston-based investment fund formed by Shaich, founder and chairman of Panera Bread.  Existing Act III investments include CAVA, Clover Food Lab, Open World, Tatte Bakery & Café and Life Alive Organic Café.

20.     Invus is a private investment firm based in New York.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Zoe's Kitchen common stock (the "Class").  Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

22.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

23.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of October 8, 2018, there were approximately 19,604,590 shares of Company common stock outstanding.  All members of the Class may be identified from records maintained by Zoe's Kitchen or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

24.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

a)     Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

b)      Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

c)      Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

25.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

26.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.   Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

27.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company and the Proposed Transaction

28.     Founded in 1995, Zoe's Kitchen develops and operates a chain of fast-casual restaurants offering a menu of Mediterranean-inspired comfort food.  The Company prides itself on delivering simple, tasty and fresh meals, made from scratch daily.  Zoe's Kitchen has grown from 21 restaurants across seven states as of December 29, 2008, to 249 restaurants across 20 states, as of February 22, 2018.

29.     In 2017, faced with a challenging restaurant sales environment, the Company experienced declining sales growth and EBITDA as well as a lower stock price.  The Board and management determined to evaluate various strategic and financial alternatives.  At a September

7, 2017 Board meeting, the Board determined to form a special committee (the "Special Committee") consisting of Defendants Baldwin and Dollarhyde, to facilitate its strategic review. On September 13, 2017, the Special Committee (on behalf of the Board) engaged Piper Jaffray as the Company's financial advisor in connection with the review.

30.     Thereafter, Piper Jaffray contacted 26 financial and strategic candidates after consultation with the Board and Special Committee.  Twenty-three of the candidates entered into non-disclosure / standstill agreements with the Company and received confidential information memorandums concerning the Company.  In early March, two candidates verbally indicated interest in continuing due diligence and the potential to offer a premium of up to 10% of the Company stock's then-current trading price if sales trends improved, but did not submit a definitive proposal.

31.     On March 2, 2018, Shaich, chairman of the board of directors and former CEO of Panera Bread, contacted Defendant Dollarhyde and expressed his interest in joining the Board. Shaich thereafter entered into a non-disclosure agreement with the Company.

32.     On March 9, 2018, Shaich contacted Defendant Dollarhyde and proposed that in connection with his potential directorship he would make a minor equity investment (or PIPE) in the Company.

33.     At a March 15, 2018 Board meeting, following discussion, the Board instructed Piper Jaffray to terminate the market check.  Also at the meeting Defendant Baldwin informed the Board that the Nominating and Governance Committee recommended that Shaich be offered a position as a Board member.  Defendant Dollarhyde informed the Board of Shaich's proposal to make a minor equity investment.

34.     On April 4, 2018, Shaich submitted a non-binding proposal to make a minority

investment in connection with joining the Board, along with due diligence requests.

35.     Thereafter, on April 19, 2018, the Company delivered to Shaich a draft term sheet setting forth the material terms and conditions upon which the Company would be prepared to enter into the proposed PIPE transaction with Shaich.

36.     Following discussions and due diligence, on April 23, 2018, Shaich informed the Company that based on the Company's proposed terms he was no longer interested in pursuing a PIPE investment.   Shaich indicated he might re-engage following the Company's earnings release for the first quarter of 2018, which the Company subsequently issued on May 24, 2018.

37.     On May 30, 2018, a representative of Morgan Stanley & Co. LLC ("Morgan Stanley") contacted Piper Jeffrey on Shaich's behalf and indicated that Shaich was interested in discussing a potential acquisition of the Company.

38.     At a June 1, 2018 Special Committee meeting, the Special Committee determined to invite Shaich to submit a written proposal to the full Board.

39.     On June 14, 2018, the Board met and discussed material issues presented concerning a confidentiality agreement with Shaich in connection with a potential acquisition transaction.   Among other things, the Board discussed Shaich's affiliations with Zoe's Kitchen's direct competitors as founder, chairman, and former CEO of Panera Bread and a director of CAVA, and that Shaich was a holder of passive limited partnership interests in Misada Capital Flagship Fund LP, then-owner of approximately 16.8% of the Company's outstanding shares. The Board further discussed a "staged" approach to providing Shaich due diligence access, as well as management's 2018 forecast and three-year (2018-2020) business plan.

40.     On July 6, 2018, Shaich delivered a non-binding indication of interest, on behalf of his controlled affiliate Act III, to acquire the Company at a cash purchase price ranging from

$12.50 to $13.50 per share.

41.     The Special Committee met and discussed the proposal the next day.  The Special Committee also discussed management's long-range business plan and the timetable for finalization of management's five-year "base case" forecasts and underlying management assumptions, which were being revised to take into account the Company's declining performance for the first and second quarters of 2018.   Also at the meeting, the Special Committee discussed the market check conducted from September 2017 – March 2018, the likelihood candidates previously contacted would be willing or able to pursue an acquisition if contacted again, and the terms of the non-disclosures agreements that remained in effect with the buyer candidates.  Following discussion, it was determined that Shaich and his co-bidders should be invited to conduct further due diligence during a 21-day exclusivity period.  The parties subsequently agreed to a 21-day exclusivity period, with a potential extension for up to 10 days in the aggregate.

42.     On July 13, 2018, on behalf of Shaich and Act III, Morgan Stanley requested to add CAVA as a co-bidder to the proposed confidentiality agreement with the Company.

43.     On July 18, 2018, the Company and Shaich entered into the Confidentiality Agreement and the Exclusivity Agreement, which provided for an initial exclusivity period expiring on August 2, 2018, subject to two five-day extensions.  The Exclusivity Agreement also provided that any definitive agreement would include a 35-day go-shop period.

44.     On July 28, 2018, Company management provided the Board and Piper Jaffray with a draft long-range business plan and financial forecasts for the Company for fiscal years 2018 through 2022.

45.     On August 2, 2018, Act III, Invus and CAVA delivered a revised, non-binding

indication of interest to acquire the Company for $13.25 per share and requested the Company extend the exclusivity period to August 15, 2018.

46.     The next day, the Special Committee met to discuss the revised proposal and the Board met to discuss the current state of the Company's business.   Company management addressed its draft long-range (2018-2022) business plan and financial forecasts, including certain key assumptions and sensitivity analyses underlying management's forecasts, the execution risks inherent in management's long-range business plan, the basis for certain of management's growth and cost assumptions, and the overall reliability and reasonableness of the long-range business plan.   Thereafter, the Board approved management's long-range business plan.   Following discussion of the revised proposal by Act III, Invus and CAVA, the Board instructed Piper Jaffray to discuss an increased $13.75 per share price with Morgan Stanley and indicate the Company was prepared to extend exclusivity through August 12, 2018.

47.     The buyer parties subsequently indicated they were not willing to increase the offer price above $13.25 and on August 10, 2018, Act III, Invus and CAVA submitted a further revised proposal to acquire the Company for $12.75 per share.

48.     On August 12, 2018, the Special Committee met and determined to recommend to the Board that it was in the best interests of the Company's stockholders to proceed with negotiations of the Merger Agreement and aim to execute and announce a definitive agreement prior to the Company's scheduled second quarter earnings release.

49.     Thereafter, the parties negotiated the remaining open terms in the merger agreement.

50.     At an August 16, 2018 Board meeting, Piper Jaffray rendered its fairness opinion. The Board determined the Proposed Transaction was in the best interests of the Company's

stockholders and approved the Merger Agreement, which the parties executed immediately following the Board meeting.

51.     Following the August 17, 2018 public announcement of the Proposed Transaction, Piper Jaffray conducted an outreach in connection with the go-shop period.  Piper Jaffray contacted 46 parties, including some, but not all of the candidates previously contacted during the market check conducted by the Company during the period from September 2017 through early March 2018.  Five of the parties contacted during the go-shop period entered into non-disclosure agreements but later withdrew from the go-shop process.

**The Proposed Transaction**

52.     On August 17, 2018, Zoe's Kitchen and CAVA issued a joint press release announcing the Proposed Transaction.  The press release states, in relevant part:

> PLANO, Texas -- Zoe's Kitchen, Inc., ("Zoës Kitchen" or the "Company") (NYSE:ZOES), a fast-casual restaurant group with 261 domestic restaurant locations, today announced that it has entered into a definitive agreement to be acquired in a transaction by privately held Cava Group, Inc., ("CAVA") a fast-growing Mediterranean culinary brand with 66 restaurants. The combined companies will have 327 restaurants in 24 states throughout the U.S.
>
> Under the terms of the agreement, Zoës Kitchen shareholders will receive $12.75 in cash for each share of common stock they hold. This represents a premium of approximately 33% to Zoës Kitchen's closing share price on August 16, 2018 and a premium of approximately 33% to Zoës Kitchen 30-day volume weighted average price ended on August 16, 2018, and an enterprise value of approximately $300 million.
>
> The acquisition of Zoës Kitchen will be financed through a significant equity investment in CAVA led by Act III Holdings, the investment vehicle created by Ron Shaich, founder, chairman, and former CEO of Panera Bread, and funds advised by The Invus Group, with participation from existing investors SWaN & Legend Venture Partners and Revolution Growth.
>
> After closing, Brett Schulman, current Chief Executive Officer of CAVA, will serve as Chief Executive Officer of the combined company and will work closely with the existing leadership teams at Zoës Kitchen and CAVA to oversee their

growth and evolution. Ron Shaich will serve as Chairman of the combined company.

COMMENTS BY LEADERSHIP

Kevin Miles, Zoës Kitchen Chief Executive Officer said: "Zoës Board of Directors and Management are pleased to announce today's transaction. Our mission was to deliver the highest value obtainable for our shareholders and pursuant to the transaction announced today our shareholders will be receiving a substantial premium to the Company's unaffected stock price. I am proud of the significant work the team has executed over recent years to grow the Zoës Kitchen footprint, build brand affinity and secure a leadership position in the Mediterranean and better-for-you category. These efforts made it an attractive candidate for a transaction of this kind. I'd like to thank each and every team member who will continue to make Zoës a differentiated dining experience every day."

Brett Schulman, CAVA Chief Executive Officer said: "Today's announcement is an exciting milestone for CAVA, and we're thrilled to welcome Zoës Kitchen to our family. Together, these two brands are united by a shared heritage and passion for exceptional Mediterranean cuisine. Now with the addition of Zoës Kitchen, we will be able to broaden our geographic footprint and meet the needs of even more guests — whether in Bethesda or Birmingham, Plano or Pasadena — who crave delicious, healthy food without compromise. As part of the CAVA family, Zoës Kitchen will benefit from CAVA's track record of bold culinary innovation and leveraging data and technology to drive growth and convenience."

Ron Shaich, Act III Holdings Chief Executive, CAVA board member, and CAVA investor said: "As a close observer of the fast-casual restaurant industry, I am thrilled at the prospect of what CAVA and Zoës Kitchen can accomplish together. Together these businesses will create the leading company in one of the most important categories in fast casual today — Mediterranean — with the capabilities to drive extraordinary customer satisfaction and powerful growth."

**Insiders' Interests in the Proposed Transaction**

53.     Zoe's Kitchen insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and Zoe's Kitchen's public stockholders.

54.    Company insiders stand to reap substantial financial benefits for securing the deal

with CAVA.  According to the Proxy Statement, certain Zoe's Kitchen equity awards, including

Company stock options, restricted shares and restricted stock unit awards held by its directors

and executive officers, will be converted into the right to receive cash payments.  The following

table summarizes the cash payments the Company's executive officers and directors stand to

receive in connection with their equity awards:

| Name | Number of Shares Subject to Company Options | Total Consideration for Company Options | Number of Company RSU Awards | Total Consideration for Company RSU Awards | Number of Company Restricted Shares | Total Consideration for Company Restricted Shares | Aggregate Consideration for Company Awards |
|---|---|---|---|---|---|---|---|
| Kevin Miles | 454,688 | $       0 | 55,416 | $    706,554 | 36,800 | $    469,200 | $   1,175,754 |
| Sunil Doshi | 165,250 | $       0 | 20,704 | $    263,976 | 19,516 | $    248,829 | $    512,805 |
| James Besch | 50,325 | $       0 | 5,687 | $    72,509 | 0 | $       0 | $    72,509 |
| Michael Todd | 62,640 | $       0 | 5,687 | $    72,509 | 0 | $       0 | $    72,509 |
| Cordia Harrington | 0 | $       0 | 5,885 | $    75,034 | 0 | $       0 | $    75,034 |
| Alec Taylor | 0 | $       0 | 5,885 | $    75,034 | 0 | $       0 | $    75,034 |
| Thomas Baldwin | 0 | $       0 | 5,885 | $    75,034 | 0 | $       0 | $    75,034 |
| Sue Collyns | 0 | $       0 | 5,885 | $    75,034 | 0 | $       0 | $    75,034 |
| Greg Dollarhyde | 0 | $       0 | 5,885 | $    75,034 | 0 | $       0 | $    75,034 |

55.    Furthermore, if they are terminated in connection with the Proposed Transaction

Zoe's Kitchen's named executive officers stand to receive substantial cash severance payments

in the form of golden parachute compensation as set forth in the following table:

**Golden Parachute Compensation**

| Name | Cash ($)(1) | Equity ($)(2) | Perquisites/ Benefits ($)(3) | Total ($) |
|---|---|---|---|---|
| Kevin Miles | $   1,750,488 | $   1,175,754 | $   15,294 | $   2,941,536 |
| Sunil Doshi | $    838,420 | $    512,805 | $   11,588 | $   1,362,813 |
| James Besch | $    264,974 | $     72,509 | $    7,725 | $    345,208 |
| Michael Todd | $    303,750 | $     72,509 | $    9,331 | $    385,590 |

## The Proxy Statement Contains Material Misstatements or Omissions

56.    The Defendants filed a materially incomplete and misleading Proxy Statement

with the SEC and disseminated it to Zoe's Kitchen's stockholders.  The Proxy Statement

misrepresents or omits material information that is necessary for the Company's stockholders to

make an informed decision whether to vote their shares in favor of the Proposed Transaction or seek appraisal.

57.     Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) potential conflicts of interest faced by Company insiders and the Company's financial advisor, Piper Jaffray; (ii) the background process leading to the Proposed Transaction; and (iii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Piper Jaffray.  Accordingly, Zoe's Kitchen stockholders are being asked to make a voting or appraisal decision in connection with the Proposed Transaction without all material information at their disposal.

***Material Omissions Concerning Company Insiders' and Piper Jaffray's Potential Conflicts of Interest***

58.     The Proxy Statement fails to disclose material information concerning the potential conflicts of interest faced by Zoe's Kitchen insiders.

59.     For example, the Proxy Statement sets forth:

> As of the date of this proxy statement, to the Company's knowledge, none of our executive officers has had any discussion or entered into any agreement with Parent or any of its affiliates regarding employment with, or the right to purchase or participate in the equity of, the Surviving Corporation or one or more of its affiliates. Prior to or following the closing of the Merger, some or all of our executive officers or other employees may discuss or enter into agreements with Parent or any of its affiliates regarding employment with, or the right to purchase or participate in the equity of, the Surviving Corporation or one or more of its affiliates. However, the Company and Parent have stated that they do not intend to enter into any such agreements before the special meeting.

Proxy Statement at 75-76.  Yet, according to the August 17, 2018 press release announcing the Proposed Transaction, "[a]fter closing . . .  [CAVA's CEO] ***will work closely with the existing leadership teams at Zoës Kitchen*** and CAVA to oversee their growth and evolution."  Emphasis

added.   The Proxy Statement, however, fails to disclose the details of all employment and retention-related discussions and negotiations that occurred between CAVA, Act III and Invus on the one hand, and Zoe's Kitchen executive officers on the other, including who participated in all such communications, when they occurred and their content, as well as whether any of Act III, Invus and CAVA's prior proposals or indications of interest mentioned management retention in the combined company or the purchase of or participation in the equity of the surviving corporation.

60.     Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.  This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

61.     The Proxy Statement also fails to disclose material information concerning the fees received by Piper Jaffray for any past work performed for the Company, CAVA and Invus.

62.     The Proxy Statement sets forth:

Piper Jaffray acted as a financial advisor to the Company in connection with the Merger and will receive a fee, currently estimated to be approximately $3.4 million from the Company. A significant portion of Piper Jaffray's fee is contingent upon consummation of the Merger, and $750,000 of such fee has been earned by Piper Jaffray for rendering its fairness opinion and is creditable against the total fee. The opinion fee was not contingent upon the consummation of the Merger or the conclusions reached in Piper Jaffray's opinion. The Company has also agreed to indemnify Piper Jaffray against certain liabilities and reimburse Piper Jaffray for certain expenses in connection with its services. Piper Jaffray is currently engaged as financial advisor for the Company in connection with the Company's review of strategic alternatives. In addition, in the ordinary course of its business, Piper Jaffray and its affiliates may actively trade securities of the Company for its own account or the account of its customers and, accordingly, may at any time hold a long or short position in such securities. In the ordinary course of its business, Piper Jaffray also publishes research on the shares Company common stock. Piper Jaffray may also, in the future, provide

investment banking and financial advisory services to the Company or the Parent or entities that are affiliated with the Company or the Parent, for which Piper Jaffray would expect to receive compensation.

Proxy Statement at 73. The Proxy Statement, however, fails to disclose any services Piper Jaffray provided to the Company, CAVA or Invus in the past two years, and any fees Piper Jaffray received in connection with those services.

63. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

64. The omission of this information renders the statements in the "Background of The Merger," "Information About Piper Jaffray," and "Interests of Certain Persons in the Merger" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning the Background Process of the Proposed Transaction***

65. The Proxy Statement omits material information relating to the sale process leading up to the Proposed Transaction.

66. In connection with the Company's September 2017 through March 2018 outreach, the Company entered into non-disclosure agreements with 23 financial and strategic candidates. Proxy Statement at 33. Indeed, at the July 7, 2018 Special Committee meeting, the Special Committee discussed "[t]he terms of the non-disclosure agreements that remained in effect with these buyer candidates . . . ." *Id.* at 39. Yet, the Proxy Statement fails to disclose whether these non-disclosure agreements include standstill provisions that are still in effect and/or contain "don't-ask-don't-waive" standstill provisions that are presently precluding these prospective bidders from making a topping bid for the Company.

67.    The disclosure of the terms of the standstill provisions in the confidentiality agreements Zoe's Kitchen entered into with potential buyers is crucial to Zoe's Kitchen stockholders being fully informed of whether their fiduciaries have put in place restrictive devices to foreclose a topping bid for the Company.

68.    Notably, during the go-shop period, Piper Jaffray contacted 46 parties, including some, but not all of the candidates previously contacted during the market check conducted by the Company during the period from September 2017 through early March 2018.  The Proxy Statement must disclose the specific reasons for not contacting the parties involved in the initial market check.

69.    The omission of this information renders the statements in the "Background of The Merger" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Piper's Financial Analyses***

70.    The Proxy Statement describes Piper Jaffray's fairness opinion and the various valuation analyses performed in support of its opinion.   However, the description of Piper Jaffray's fairness opinion and analyses fails to include key inputs and assumptions underlying the analyses.  Without this information, as described below, Zoe's Kitchen's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Piper Jaffray's fairness opinion in determining whether to vote their shares in favor of the Proposed Transaction or seek appraisal.  This omitted information, if disclosed, would significantly alter the total mix of information available to Zoe's Kitchen's stockholders.

71.    With respect to Piper Jaffray's *Discounted Cash Flow Analysis ("DCF")*, the Proxy Statement fails to disclose: (i) unlevered free cash flows ("UFCF") from the second half of fiscal 2018 to fiscal year 2022, after taking into account treatment of stock based compensation

as a cash expense;[1] (ii) quantification of the stock-based compensation that was treated as a cash expense for purposes of Piper Jaffray's DCF; (iii) quantification of the inputs and the assumptions underlying the discount rates ranging from 9.2% to 14.2%; (iv) the estimated remaining net operating loss ("NOL") balance at fiscal year 2022; and (v) the implied perpetuity growth rate range resulting from the analysis.

72.    With respect to Piper Jaffray's *Selected Public Companies Analysis* and *Selected Precedent Transactions Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the companies and transactions observed by Piper Jaffray in its respective analyses.

73.    Similarly, with respect to Piper Jaffray's *Premiums Paid Analysis*, the Proxy Statement fails to disclose the transactions reviewed by Piper Jaffray, as well as the individual premiums of the consideration offered in each transaction.

74.    When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

75.    The omission of this information renders the statements in the "Opinion of Piper Jaffray & Co." section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

76.    The Individual Defendants were aware of their duty to disclose the above-referenced omitted information and acted negligently (if not deliberately) in failing to include

---

[1] The Proxy Statement sets forth the line items utilized to calculate the Company's UFCF for the second half of 2018 to 2022.  Proxy Statement at 70.  The Proxy Statement then states, "[i]n addition, stock based compensation was treated as a cash expense for purposes of determining unlevered free cash flow."  *Id.* at 69.  Thus, without the value of stock-based compensation, Company stockholders are unable to determine by how much the Company's UFCF was deducted for purposes of Piper Jaffray's DCF.

this information in the Proxy Statement.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed voting or appraisal decision in connection with the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants for Violations of Section 14(a) of the
Exchange Act and Rule 14a-9 Promulgated Thereunder**

77.     Plaintiff repeats all previous allegations as if set forth in full.

78.     During the relevant period, Defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

79.     By virtue of their positions within the Company, the Defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by the Defendants.  It misrepresented and/or omitted material facts, including material information about potential conflicts of interest, the sales process for the Company, and the financial analyses performed by the Company's financial advisor.  The Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

80.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction or whether to seek to exercise their appraisal rights.

81.     By reason of the foregoing, the Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

82.     Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

83.     Plaintiff repeats all previous allegations as if set forth in full.

84.     The Individual Defendants acted as controlling persons of Zoe's Kitchen within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Zoe's Kitchen, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

85.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

86.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy Statement at issue contains the

unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy Statement.

87.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

88.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

89.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, Zoe's Kitchen's stockholders will be irreparably harmed.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Zoe's Kitchen, and against Defendants, as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed

Transaction and any vote on the Proposed Transaction, unless and until

Defendants disclose and disseminate the material information identified above to

Zoe's Kitchen stockholders;

C.      In the event Defendants consummate the Proposed Transaction, rescinding it and

setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange

Act, as well as SEC Rule 14a-9 promulgated thereunder;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for

Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  October 12, 2018

**O'KELLY ERNST & JOYCE, LLC**

By  */s/ Ryan M. Ernst*
       Ryan M. Ernst (#4788)
       901 N. Market St., Suite 1000
       Wilmington, DE 19801
       Tel.: (302) 778-4000
       Email: rernst@oelegal.com

**OF COUNSEL:**

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly K. Moran
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato
885 Third Avenue, Suite 3040
New York, New York 10022
Tel: (212) 308-5858
Fax: (212) 486-0462
Email: fortunato@bespc.com

*Attorneys for Plaintiff*